# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 12, 2012

## STATE OF TENNESSEE v. TROY ECTOR

### Direct Appeal from the Criminal Court for Shelby County
### No. 0907890    J. Robert Carter, Judge

---

### No. W2011-02039-CCA-R3-CD  - Filed August 8, 2012

---

A Shelby County jury convicted the Defendant, Troy Ector, of especially aggravated kidnapping, carjacking, and employing a firearm during the commission of a felony, and the trial court sentenced him to a twenty-two year effective sentence.  On appeal, the Defendant contends that the evidence was insufficient to sustain his convictions and that the trial court erred when it denied his request for a jury instruction on the lesser-included offense of unauthorized use of a motor vehicle.  After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Harry E. Sayle, III (on appeal) and Jennifer Case (at trial), Memphis, Tennessee, for the appellant, Troy Ector.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General, and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the kidnapping of the victim from her home on March 10, 2009. The Shelby County grand jury indicted the Defendant for especially aggravated kidnapping, aggravated rape, carjacking, and employing a firearm during the commission of a felony.  At the Defendant's trial on these charges, the parties presented the following evidence: Bobbi

Turner, the victim's mother, testified that on March 10, 2009, she and her daughter went to Tunica to "get away" for a few hours. Turner recalled that the victim came to her home, picked her up, and then, after they returned from Tunica, dropped her back off at her house. Turner said the victim escorted her inside to ensure she was safe and then left her home at around 9:20 p.m.

Turner testified that the victim lived between seventeen and twenty-two minutes from her home, and Turner expected the victim to call her when she arrived home safely. Turner said she "got disturbed" when she did not hear from the victim. She attempted to call her multiple times, but the victim did not answer. Turner recalled that, on her third or fourth attempt to reach the victim, someone answered the call but said nothing. Turner said her daughter's name into the telephone but received no response.

Turner testified that, over an hour later, the victim called her sounding "upbeat" and "happy." Turner thought the victim was not acting like herself and sounded as if she had been crying. Turner felt as if the victim did not want to tell her what was wrong. The victim kept saying "I'm fine" and "I'm all right" and "God is good."

During cross-examination, Turner testified that the victim had children and that they were with a sitter at the victim's apartment while the two went to Tunica. She said she did not see the victim consume any alcohol while at the casino.

The victim testified that, in March 2009, she lived in the Cedar Mill Apartments with her fiancé and her three children. She said that, on March 10, 2009, she left her three children at her house with her cousin as a babysitter, and she picked up Turner and took her to the casinos in Tunica, where they played games for three hours. When they were done, she dropped Turner back off at her house and then returned to her apartment, arriving at around 9:40 or 9:45 p.m. The victim said she parked her car, locked her doors and got out of her car. As she was going toward the outside stairs of her apartment building, a man wearing blue jeans and two T-shirts and brandishing a black gun walked up behind her.

The victim said the man, whom she had never seen before, told her not to say a word and to "just do like I say." The victim, scared for her life, remained silent. The man took her keys and her purse and then, still pointing the black gun at her, "walked" her around to the passenger side of her 2009 Ford Crown Victoria and made her get into the car. He then got into the driver's seat, started the car, and drove away. The man drove less than a block to another apartment community, Aspenwood Apartments.

The man repeated to her that she should comply with his orders because, if she did not, he had a fully loaded gun that he would use it to take her life. The victim said she asked

2

the man why he was doing this to her, and she told him that she had children. She asked him what he wanted and told him that, while she did not have much, he could have any of her possessions. The man told her that he did not care about her children and that he did not care about anything because he did not have a family. His family was dead. The man told her to be quiet and not say a word because she was talking too much.

The victim said the man pulled the car into the apartment complex and parked it in a parking lot by an apartment building. She recalled that her cell phone rang three or four times, and the man answered the call and listened. After listening for a brief time, he hung up the phone. The victim said she reiterated her desire to go back to her children. The man moved the car to a different parking spot, and answered the cell phone again. Again, he hung up the phone after listening for a short period of time.

The victim said that the man then asked her what she would be willing to do, or to give up, in order to keep her life and return to her children. The victim said she expressed her confusion, told him that she had nothing, and that everything she had was in her purse, which he already possessed. The man reiterated his question, and, after a time, asked her if she would have sex with him. The victim said she lied and told the man she was infected with a disease, hoping to make him not want to have sex with her. The man said that, although she was infected, she could give him oral sex. The victim responded that she could not because she had recently had a root canal and there was a chance her mouth would bleed. The victim testified that this was also a lie.

The victim said the man told her he did not care about the potential that her root canal would bleed, and he forced her to unzip his pants. The man, who was not erect at the time, forced her head down and made her perform oral sex on him. At some point during the approximately twenty minutes of oral sex, the man rubbed her buttocks and her breasts. He eventually ejaculated into her mouth, and she spit it back out onto him. The man used his shirt to clean himself and then put the car into gear and began driving.

The victim recalled the man said to her, "[T]hey want me to kill you but I'm not going to do that since I see you have children." The man then turned in the opposite direction of her apartment complex, and the victim asked him where he was going, telling him she lived in the other direction. The man responded, "[W]ell I'm not from here. I'm not sure. I'm really lost." The man then turned the car around and took her back to her apartment complex.

When they arrived at her apartment complex, the man told her to get out of the car. The victim complied, saying she was "trying to . . . hurry up." She then stopped and told the man she could not get into her apartment. She asked him for the key to her house. The man

3

took her key off the key ring and gave it to her. The victim said she also told the man that she needed her car to get her children to school. The man told her that he would return her car in the morning. He also told her that he did not "play" so she should not call the police or anyone else or he would "take [her] life."

The victim said that, when she entered her apartment, her babysitter knew something was wrong. The babysitter called "Gary," the victim's fiancé, and when Gary returned to the house, the victim called the police. The victim said that, while waiting for police, she took a shower and put her clothes into the trash. She brushed her teeth and gargled with mouthwash. Police arrived and took her to the rape crisis center, where she was examined, interviewed, and treated.

The victim testified that, four days later, she, her children, and her fiancé, were packed and leaving for Memphis. They stopped for gas before they got onto the highway to leave town. At the gas station, she saw her white Crown Victoria. She saw that there were two people in her car, and she immediately called police. The victim said that, after seeing her car, she decided not to leave town, hoping that the police would find her car and the man who had taken it.

The victim said that, a couple hours after she saw her car, the police called her and asked her to come to the police station. Officers showed her a photographic lineup, from which she identified a picture of the Defendant.

During cross-examination, the victim testified that she was twenty-seven at the time of the attack. She said that she was talking to a co-worker on the phone at the time that the Defendant approached her with a gun. The Defendant "made" her hang up the phone. She said she did not see the Defendant get out of a car but that, as she was parking, a car with four or five "guys" passed her. She said she thought this car was connected to her attack. The victim described the gun as "all black," and she said that she told police it was a revolver and a "38." She said she was not good at "naming" guns, so she said she may have been mistaken when she spoke with police. Defense Counsel highlighted several inconsistencies between the victim's statement to police and her trial testimony.

The victim conceded that she listed Turner's address as her own when she applied for the title to her car. She explained that she did not want the title to be mailed to her apartment because she thought it might be stolen. She agreed that the title asked if the information she provided was accurate but that she provided the wrong address.

Gary Evans, the victim's fiancé and the father of the victim's children, testified that he lived with the victim and their children at an apartment in Memphis in March 2009. On

4

March 10, 2009, he was at a friend's house playing video games when his babysitter called him and "sounded kind of hysterical." Based upon what the babysitter told him, he went back home, where he found the victim not acting "like herself." He described her as "[u]pset, afraid, angry, [and] distraught." Evans said that the police were called and, when they arrived, he heard the victim tell police what had happened. The victim told police that she was robbed at gunpoint and that the robber took her car and forced her to perform oral sex.

Evans recalled that, four days after this incident, he and the victim were preparing to leave Memphis. When they stopped to fill the gas tank, Evans noticed their Crown Victoria drive past them. He called 911 and told police he had seen their car.

Officer Darnell Bridgeforth, with the Memphis Police Department, testified that he and a trainee, Laurice Bobo, responded to the victim's call about her attack. He arrived at the victim's apartment at 11:17 p.m. and found her "upset," "crying," and "distraught." The victim told him that, when she got out of her car, a black man approached her from behind with a gun and made her get back into her car. The victim described how the man drove to another apartment complex and forced her to perform oral sex on him. She said he then returned her to her house, told her to get out of her car, and drove away. Officer Bridgeforth brought the victim to the nearby adjacent apartment complex, so she could point out where the attack occurred. When he did so, the victim became distraught again. The officer then took the victim to "MSARC," a rape crisis center, to be examined by the doctors.

On cross-examination, Officer Bridgeforth testified that the victim reported only one suspect related to this incident. His report did not indicate that the victim mentioned her attacker making any telephone calls. The officer said the victim told him that her attacker had taken her Tennessee driver's license, among other things.

Officer Eric Carlisle, with the Memphis Police Department, testified that his responsibilities included collecting evidence at crime scenes. He said he was called to a location on March 14, 2009, where he saw a white Ford Crown Victoria upon his arrival. He and his partner, J.K. Smith, photographed the car and recovered a handgun from the car. Officer Carlisle removed the magazine from the gun and noted that there were live rounds in the magazine. Officer Carlisle then had the car towed to the law enforcement office.

During cross-examination, Officer Carlisle testified that the gun that he found in the car was a 380 semi-automatic handgun, and it was not a revolver.

Officer Eric Petrowski, with the Memphis Police Department, testified that in March 2009, he was a uniformed patrol officer. On March 14, 2009, he heard a dispatch call about

a stolen white Ford Crown Victoria. He called dispatch for more information, and they gave him the victim's contact information. After speaking with the victim and obtaining additional information about the description of the vehicle, the officer saw a car pass him that he believed might be the victim's stolen vehicle. He pulled behind the car, ran the car's tags, and then called the dispatcher to inform her that he had found the stolen vehicle. The officer said he and other officers followed the vehicle until it pulled into the driveway of a home. The Defendant got out of the vehicle, and police officers immediately detained him. Officer Petrowski transported the Defendant to the police station.

During cross-examination, Officer Petrowski testified that he did not read the Defendant his rights. He did, however, elicit some information from the Defendant, including that the Defendant was eighteen at the time and lived at the address where he was apprehended.

Sergeant Clyde Jefferson, with the Sex Crime Bureau of the Memphis Police Department, testified that he was the lead investigator in this case. The sergeant said that he sat with another officer, Lieutenant Anthony Carter, as Lieutenant Carter questioned the Defendant. He also watched the victim view the photographic lineup and was present while she gave her statement to police. Sergeant Jefferson said that the victim gave her statement on March 10, 2009, and that police had not developed a suspect before police officers recovered the victim's stolen car that the Defendant was driving.

Sergeant Jefferson testified that, after the Defendant was arrested, they placed him in jail on a "forty-eight hour hold," knowing they would charge him with at least theft of a motor vehicle. During this forty-eight hours, police officers created and showed the victim a photographic lineup that included a photograph of the Defendant and several other men with similar features to those of the Defendant. The victim identified the Defendant as her attacker.

Michaele Byers, an employee of the Shelby County Sheriff's Department, Jail Division, testified that he maintained inmate records. His records showed that the Defendant's date of birth was June 6, 1990.

Based upon this evidence, the jury convicted the Defendant of especially aggravated kidnapping, carjacking, and employing a firearm during the commission of a felony. The trial court sentenced him to an effective sentence of twenty-two years, to be served at 100%.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his

convictions and that the trial court erred when it denied his request to have the jury instructed on the lesser-included offense of joyriding.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions. He notes that the jury acquitted him of the aggravated rape count, which he interprets to mean that the jury found the victim's testimony not credible. Based upon her lack of credibility, he concludes that he should be acquitted of all the charges. The State counters, first, that the Defendant has waived this issue by failing to adequately brief it. The State further avers that the jury's guilty verdicts, approved by the trial court, accredit the State's witnesses and resolve all conflicts in the evidence in favor of the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'"

7

*State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The State correctly asserts that the Defendant's brief is inadequate in its citations to legal authority supporting his contention on appeal. This Court requires that the Defendant on appeal present an argument, make appropriate references to the record, and cite relevant legal authority in support of his argument. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Additionally, all Tennessee appellate courts require the appellant's brief to contain an argument, citations to authorities, and appropriate references to the record. *See* Tenn. R. App. P. 27(a)(7)(A) ("The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on."). Failure to comply with these basic rules will ordinarily constitute a waiver of the issue. *See* Tenn. Ct. Crim. App. R. 10(b); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

Even if this Court to overlook the brief's deficiencies, the Defendant would still not be entitled to relief. As indicated, this Court may not resolve questions of witness credibility on appeal. That function is solely within the province of the trier of fact. *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). The jury, by its verdict, accredited the victim's testimony

concerning the crimes for which the Defendant was convicted. Further, the victim's testimony was supported by other circumstantial evidence against the Defendant, which included the following: the Defendant was apprehended driving the victim's car; a gun was in the car at the time he was apprehended; and the victim picked the Defendant out of a photographic lineup. We will not disturb the jury's findings. The evidence was sufficient to sustain the Defendant's convictions.

## B. Jury Instruction

The Defendant next contends that the trial court erred when it failed to instruct the jury on the lesser-included offense of unauthorized use of an automobile, also referred to as joyriding. *See* T.C.A. § 39-14-106 (2010). He notes that he filed a motion requesting a jury instruction on this offense, which the trial court denied. The Defendant argues that this instruction was warranted because the proof showed that the Defendant returned the victim's house keys to her when he dropped her off and told her that he would return her car in the morning. The State responds that the facts of the case do not support an instruction for joyriding and that the trial court, therefore, properly refused to instruct the jury on this offense. We agree with the State.

The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001) (citing *State v. Smiley*, 38 S.W.3d 521 (Tenn. 2001)). The standard of review for mixed questions of law and fact is *de novo* with no presumption of correctness. *Id.*; *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). A trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *see also* Tenn. R. Crim. P. 30(d)(2). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992).

"In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002). In *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999), our Supreme Court adopted the following two-step process for determining if the evidence justifies a jury instruction on the lesser-included offense:

First, the trial court must determine whether any evidence exists that

reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

*Id.* at 469.

The statutory definition of carjacking requires "the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) A deadly weapon; or (2) Force or intimidation." T.C.A. § 39-13-404(a) (2010); *State v. Wilson*, 211 S.W.3d 714, 722 (Tenn. 2007) (holding that carjacking prosecutions do not include the burden of proving an intent to deprive the victim of the vehicle and that, therefore, the motive for the taking is irrelevant). Unauthorized Use of a Motor Vehicle is statutorily defined in Tennessee Code Annotated section 39-14-106, which provides "[a] person commits a Class A misdemeanor who takes another's automobile, airplane, motorcycle, bicycle, boat or other vehicle without the consent of the owner and the person does not have the intent to deprive the owner thereof." Unauthorized use of a motor vehicle is a lesser-included offense of carjacking. *See State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999); *see e.g., State v. Donald Bradley Williams*, No. M2008-00176-CCA-R3-CD, 2009 WL 1643444, at *1 (Tenn. Crim. App., at Nashville, June 12, 2009) (where this Court affirmed a defendant's guilty plea to unauthorized use of a motor vehicle as a lesser-included offense of the charged offense of carjacking), *no Tenn. R. App. P. 11 application filed*.

We conclude the trial court did not err when it refused to instruct the jury on the lesser-included offense of unauthorized use of a motor vehicle. The proof showed that the Defendant approached the victim brandishing a gun and forced her to get into her car. He drove her, at gunpoint, to another location. The Defendant told the victim that "they" wanted him to kill her but that he was not going to because she had children. The Defendant then drove the victim back home, where she asked him for the key to her apartment and asked him not to take her car because she needed it to drive her children to school. The Defendant gave the victim her key and told her that he would return her car the following morning. The Defendant, however, never returned the victim's car, and the police apprehended him driving the vehicle. We agree with the State that the trial court did not err when it declined to instruct the jury on the lesser-included offense of unauthorized use of a motor vehicle. The Defendant is not entitled to relief on this issue.

10

## III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE